******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* SHEILA DAVALLOO
(SC 19416)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued October 14, 2015—officially released January 12, 2016*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *James M. Bernardi*, supervisory assistant state's attorney, and, on the brief, *David I. Cohen*, former state's attorney, and *Maureen Ornousky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. This certified appeal addresses the scope of the marital communications privilege codified in General Statutes § 54-84b.[1] The defendant, Sheila Davalloo, was convicted, after a jury trial, of murder in violation of General Statutes § 53a-54a. The defendant appeals from the judgment of the Appellate Court affirming that conviction after concluding that her statements to her husband, Paul Christos, did not fall within the protection of § 54-84b. *State* v. *Davalloo*, 153 Conn. App. 419, 436, 449, 101 A.3d 355 (2014). Because we conclude that the defendant's statements were not "induced by the affection, confidence, loyalty and integrity of the marital relationship," as § 54-84b (a) requires, we hold that the statements were not protected by the marital communications privilege. Accordingly, we affirm the judgment of the Appellate Court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the defendant's claim.[2] This case involves a love triangle that took a deadly turn. The defendant became infatuated with Nelson Sessler, her coworker at Purdue Pharma, Inc., a pharmaceutical company in Stamford. *State* v. *Davalloo*, supra, 153 Conn. App. 421. The victim, Anna Lisa Raymundo, also was a fellow Purdue Pharma, Inc., employee and the third member of the love triangle. Id. In late 2000, Sessler met Raymundo at an after work happy hour and, in the summer of 2001, Sessler met the defendant for the first time at another after work happy hour. The defendant told Sessler that she was divorced, although she was still married to Christos. Sessler began separate sexual relationships with both the defendant and Raymundo. Id.

During their relationship, the defendant and Sessler would rendezvous periodically at the defendant and Christos' condominium unit in Pleasantville, New York. Before Sessler would visit, the defendant would tell Christos that her mentally ill brother was coming over and that Christos should leave and take his belongings with him because her brother would react badly if he found out that she was married. Id., 421–22. Christos believed this because he had been told by the defendant's parents that the defendant, in fact, had a mentally ill brother. Id., 422.

In the summer of 2002, Sessler focused his attentions on Raymundo, and the two became a couple. Id. Even though Sessler maintained his separate apartment in Stamford, "he spent the majority of [his] time at Raymundo's apartment, located at 123 Harbor Drive, apartment 105, in Stamford. . . . Sessler's relationship with Raymundo continued after Raymundo left Purdue Pharma [Inc.] in 2002 and began a new job at another pharmaceutical company, Pharmacia, in New Jersey. Despite working in New Jersey, Raymundo continued

to live at her apartment in Stamford." Id.

Also in 2002, the defendant concocted a story about a love triangle among three fictional coworkers at Purdue Pharma, Inc.: "Melissa," "Jack," and "Anna Lisa." Id. Nearly every day, she recounted the tale to Christos from the perspective of her purported friend "Melissa." Id. In actuality, "Melissa" was the defendant; "Jack" was Sessler; and "Anna Lisa" was Raymundo. Id. The defendant told Christos intimate details about Melissa and Jack including that Melissa was upset when Jack rebuffed her sexual advances. Id., 422–23. Additionally, "[s]he once said that Melissa had discovered Jack's travel plans and had flown to Jack's destination. She then conveniently ran into him at the airport as he was boarding a plane home and sat next to him on the return flight.[3] The defendant constantly asked Christos for advice 'on behalf' of Melissa with questions such as why Jack was in a relationship with two women and why Jack was cheating on one woman with the other. Christos listened to these stories to 'humor' the defendant.

"Eventually, the defendant told Christos that she 'wanted to go on a stakeout' with Melissa in order to 'spy on Jack.' Although Christos thought the proposed surveillance was 'a little odd,' he did not believe it would actually occur; he gave the defendant a pair of night vision binoculars. The defendant told Christos that she had purchased a lock pick set for Melissa because Melissa wanted to break into Anna Lisa's apartment to look at photographs in order to 'get a sense of the relationship between Jack and Anna Lisa.' The defendant practiced with the lock pick set on the front door of their Pleasantville condominium unit. The defendant also asked Christos for an eavesdropping device that she knew he owned in order to assist Melissa in planting the device in Jack's office so they could listen in on his conversations. Early one morning, the defendant telephoned Christos to inform him that she and Melissa were outside Anna Lisa's apartment and asked Christos if Melissa should confront Anna Lisa. Christos told the defendant that Anna Lisa had a 'right to know her boyfriend is cheating on her . . . .' In time, Christos became 'sick' of the stories of the love triangle and '. . . got angry' with the defendant.

"The defendant also related the story of the love triangle to Emilio Mei and Tammy Mei, friends of the defendant and Christos, to Christos' parents and to 'one or two other friends as well.' The defendant told Tammy Mei about Melissa '[a]lmost every time [they] spoke' and would ask her questions such as whether she thought Jack would break up with Anna Lisa and date Melissa. The defendant told Tammy Mei that Melissa had access to Jack's voice mail and would listen to it on a daily basis to see if he was still seeing Anna Lisa or any other woman. She also told Tammy Mei that

Jack 'tried to set Melissa up with one of his friends,' but that it did not go well because 'Melissa just wanted to be with Jack.'[4] The defendant 'quite a few times' asked Tammy Mei if Melissa should confront Anna Lisa to 'let her know that she [Melissa] was also seeing Jack.' Tammy Mei advised against this confrontation, but sensed that the defendant wanted her to say that Melissa should confront Anna Lisa.

"A few minutes after noon on November 8, 2002, the Stamford Police Department received a 911 call in which the caller reported that a man was assaulting someone at 123 Harborview, apartment 105; the caller claimed to be a neighbor [but was later identified at trial as the defendant]. The dispatcher knew that Harborview was a commercial area without apartments and knew the given address had to be incorrect. After the caller ended the call, the dispatcher called back the number and discovered that the call had come from a pay phone at a Dutchess restaurant on Shippan Avenue in Stamford. The dispatcher telephoned the Dutchess restaurant and spoke to a manager, who had not noticed anyone at the pay phone. The dispatcher sent officers to 123 Harbor Drive, apartment 105, which she knew was a residential facility near the Dutchess restaurant.

"An officer knocked on the door of apartment 105 and received no answer. He pushed the door open and saw the deceased victim, Raymundo, on the floor of the front foyer. The officers saw no signs of forced entry, burglary, or ransacking. [Raymundo] had died from multiple stab wounds and her injuries indicated a violent struggle.

"In the course of [the] investigation, officers found details whose relevance later became apparent. At 11:57 a.m. [on the day of the murder, Raymundo's] home telephone had been used to place a call to Sessler's office; Sessler had not answered the call and no voice message had been left. Officers discovered a bloodstain on the handle of a bathroom sink, which suggested that the assailant had tried to clean up after the crime. The bloodstain much later was determined to contain 'all of the different genetic elements that [were] present' in the DNA profiles of both the defendant and [Raymundo]. The state's expert testified that due to the fact that [Raymundo] cleaned her apartment regularly, as testified to by Sessler and [Raymundo's] parents, and the fact that the sink handle was nonporous, it was 'extremely, extraordinarily unlikely' that any DNA left by the defendant on the sink handle prior to November 8, 2002, would have lasted or remained 'very long . . . .'" (Footnotes altered.) Id., 423–25. Additionally, Christos noticed one day in late November, 2002, that the defendant came home from work with a "'nasty cut'" on her thumb. Id., 426. She explained to Christos that she had cut her thumb opening a can of dog food for their two dogs. Id.

"When Sessler returned after work to [Raymundo's] apartment, where he frequently stayed, police officers questioned him. Sessler gave officers the names of two other women he dated who suffered from mental illnesses. He did not at that time tell police officers about his overlapping sexual relationships with [Raymundo] and the defendant. After several hours of questioning, the police released Sessler. The police were unaware, at this point, of any connection between the defendant and the crime.

"After [Raymundo's] death, the defendant pursued Sessler. She sent him a care package, consoled him, and was one of the few people willing to talk to Sessler about Raymundo at a time when most people '. . . shunned him.' In January, 2003, the defendant invited Sessler to go on a group ski trip. The 'group' turned out to be only Sessler and the defendant. Sessler again entered into a sexual relationship with the defendant. The defendant would invite Sessler to her residence, but, again, only after having first told Christos that her mentally ill brother was visiting." Id., 425–26.

"As part of his work, on November 13, 2002, Christos had a meeting with representatives from Pharmacia, where Anna Lisa had worked. The representatives mentioned that a colleague of theirs had been recently murdered. Although a name was not mentioned, Christos began to wonder if Melissa did something to Anna Lisa. Christos mentioned to the defendant that an employee at Pharmacia had been killed and asked whether Melissa was involved and if Anna Lisa was 'okay. . . .' The defendant did not seem shocked or surprised and responded, without elaboration, that Anna Lisa was 'fine.' Christos testified at trial that he believed that, at that point, the defendant thought that he had made that connection. In late 2002, the defendant reported to Christos that Jack and Anna Lisa had 'broken up' and that Melissa and Jack were together exclusively. But also in late 2002, the defendant asked Christos for information about fingerprints and DNA.

"On December 8, 2002, during dinner, the defendant also asked Emilio Mei and Tammy Mei about DNA and fingerprints, and questioned whether 'they have everybody's DNA on file.' In early 2003, Tammy Mei noticed that, although the defendant continued to talk about Jack and Melissa, she had not spoken about Anna Lisa in a while. Tammy Mei asked the defendant about Anna Lisa, and the defendant responded that Jack and Melissa were a happy couple; Anna Lisa had moved to New Jersey because she had obtained a job there.

"In 2003, the frequency of trysts at the Pleasantville condominium—under the guise, so far as the defendant told Christos, of her mentally ill brother's visiting—increased. Christos was [frustrated with] . . . leaving when the defendant's 'brother' visited and told the

defendant that her brother 'ha[d] to be told that [they were] married.'

"On March 22, 2003, the defendant described a guessing game to Christos. The game involved one person's being handcuffed and blindfolded while the other placed objects against the bound person's skin; the bound person was to guess the identity of the object. The following day, the defendant asked Christos if he wanted to play the guessing game. The defendant was the first to be bound and blindfolded. She guessed various household items.

"Then it was Christos' turn. He lay on the floor, blindfolded and handcuffed to a chair. Christos guessed various common household items. The defendant then went to the kitchen to retrieve 'one last item . . . to guess.' She sat on Christos' midsection and touched the item to his face; Christos guessed the item was a candle. The item was a knife. The defendant thrust the knife into Christos' chest, paused and then again thrust the knife into Christos' chest. The defendant said, 'Oh, my God, I think I hurt you. You're bleeding.' Still blindfolded and handcuffed, Christos asked the defendant what had happened. She explained that 'something fell on you. I think the candle hurt you.' Christos asked the defendant to remove the blindfold, and she did. But when he asked her to remove the handcuffs, she stated that she could not find the key. At Christos' request, the defendant helped him break the chair to which the handcuffs were attached.

"Christos asked the defendant to call 911. He heard the defendant seem to make a 911 call, but, after a significant amount of time had passed, no ambulance arrived. Christos asked the defendant to call 911 again and he asked to talk to the operator. The defendant told Christos that the operator did not want to talk to him, but rather wanted him to lie on the floor. The defendant at this point instead telephoned Sessler and invited him over to the condominium for dinner.

"Eventually, Christos, still conscious, asked the defendant to take him to a nearby hospital, and the defendant obliged. She drove slowly, according to Christos, and parked in the rear of the Behavioral Health Center of Westchester Medical Center in Valhalla, New York. The defendant got out of the car and opened the rear driver's side door. Christos thought the defendant was going to help him out of the car until he saw an angry expression on her face and saw her lunge at him with the knife. Christos managed to get out of the car and attempted to wrestle the knife out of the defendant's hands. The melee moved to a grassy spot in the parking lot, while Christos visibly was bleeding through his shirt. The defendant begged Christos to 'stay with me, talk to me . . . .' Christos broke free, ran about 200 feet, and yelled to a medical resident and another person, who were near the entrance to the Behavioral

Health Center. The resident called 911. The defendant asked the resident to let her take Christos to the emergency room. The resident refused. The defendant was arrested, in New York, for attempted murder in connection with this incident.

"When Sessler arrived at the defendant's condominium for dinner, he found police officers searching the residence. Police officers informed him that there had been a domestic dispute and that Christos was in a hospital. Later, after reading an article in a newspaper about the stabbing, Sessler contacted the Stamford police and informed them that they should consider the defendant to be a suspect in the death of Raymundo. Eventually, Sessler told officers about his concurrent affairs with the defendant and Raymundo. Days after Christos' stabbing, the Stamford police contacted Christos about the death of Raymundo. Christos gave the officers several written statements and the defendant's phone records." Id., 426–29.

Christos survived his injuries and testified in the Connecticut jury trial of the defendant for the murder of Raymundo. Id., 429. Prior to trial, however, the defendant filed a motion in limine seeking to prevent Christos' testimony on the basis of the marital communications privilege. Id. The state also filed a motion in limine, requesting a determination that certain statements between the former spouses were admissible. Id. The testimony at issue dealt with the defendant's statements and actions during the course of the marriage pertaining to the relevant events.[5]

On June 3, 2011, the court heard arguments relating to the motions in limine and ruled that " 'these statements . . . were not made in furtherance or induced by affection, confidence, loyalty, and integrity of the relationship; quite the contrary. It is just the opposite. The statements made to the run-up of the murder of [Raymundo], the description of a faux triangle, again, for lack of a better word, it would be bizarre to classify those as in furtherance of the sanctity of the marital relationship. The plan here was to do in a potential third party suitor of [Sessler] . . . and, ultimately, [Christos], have him removed from the scene either by way of divorce and/or physically remove him from the scene. And, in fact, this defendant was convicted of the attempted murder of her husband in those [New York] proceedings. So, those statements leading up to the run-up in this triangle and whatnot for various reasons don't fall within the purview of the marital privilege. To rule that way would be . . . bizarre. Statements after the death of Raymundo to accommodate the relationship with Sessler fall in the same category, as well as the statements leading up to and relative to the attack and attempted murder of [Christos].' " Id., 430. The trial court further stated that, "[t]o argue that these [statements] were in furtherance of the marital relationship

defies common sense, are in fact bizarre, and could only be applicable to some parallel universe . . . with which I am not acquainted." The court then granted the state's motion and denied the defendant's motion.

After a jury trial, the defendant was convicted of murder in violation of § 53a-54a. She was sentenced to fifty years imprisonment to be served consecutively to a sentence she received in New York for her conviction based on the attempted murder of Christos.

On appeal to the Appellate Court, the defendant argued that her statements to Christos were improperly admitted by the trial court in violation of the marital communications privilege[6] because the trial court had inquired into the quality of the marriage, contrary to this court's holding in *State* v. *Christian*, 267 Conn. 710, 841 A.2d 1158 (2004), and because the communications at issue, which pertained to personal matters, fell within the statutory parameters of the privilege. *State* v. *Davalloo*, supra, 153 Conn. App. 433–34. The Appellate Court disagreed, concluding that the trial court properly had focused on the nature of the communications, and not the quality of the marriage. Id., 434. According to the Appellate Court, "[t]he [defendant's] statements quite clearly were meant to deceive Christos, so that he would leave the marital home and her affair with Sessler would be enabled, would give advice and assistance to her so that she could further her affair with Sessler, [and] would assist in his own demise by submitting to being restrained and by accepting the defendant's false assurances that she was trying to secure medical assistance." Id., 435–36. Thus, the Appellate Court concluded that the defendant's statements were not "induced by the affection" of the marital relationship. Id., 435. This appeal followed.[7]

The defendant claims that the Appellate Court, in holding that the marital communications privilege was inapplicable, misconstrued § 54-84b to require that the privileged statement must strengthen a marital relationship, thereby necessitating an improper examination of the state of that relationship. The defendant argues that the language in § 54-84b (a), which requires that the communication must be "induced by the affection, confidence, loyalty and integrity of the marital relationship," simply reflects the common-law requirement that the confidential statements must relate to the marital relationship and not to everyday conversations incidental to marriage. According to the defendant, the statements at issue were thinly veiled confessions of adultery and, therefore, fell squarely within the privilege. The state argues that the legislature, by including the language at issue, plainly and unambiguously intended to add an additional element, and thereby narrow, the common-law privilege as articulated in *Christian*, and that the Appellate Court, like the trial court, correctly concluded that the defendant's statements fell far short

of satisfying that element. We agree with the state that the language does plainly and unambiguously add an element to the marital privilege.[8]

As a preliminary matter, we address the proper standard of review. "The scope of an evidentiary privilege is a question of law, which we review de novo. . . . The application of the privilege presents a mixed question of law and fact." (Citation omitted.) *State* v. *Mark R.*, 300 Conn. 590, 597, 17 A.3d 1 (2011). Thus, "[t]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *State* v. *Christian*, supra, 267 Conn. 732–33. "[B]ecause testimonial privileges prevent full disclosure of the truth, they are to be strictly construed." *State* v. *Mark R.*, supra, 598.

To the extent that our review requires us to interpret § 54-84b, the statute codifying the marital communications privilege, our review is plenary. See *State* v. *Adams*, 308 Conn. 263, 269–70, 63 A.3d 934 (2013). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *State* v. *Fernando A.*, 294 Conn. 1, 13–14, 981 A.2d 427 (2009).

On appeal, the parties do not dispute the underlying facts regarding what the defendant told Christos, but only the question of whether, given those facts, the marital communications privilege should have applied. Because our review concerns the scope of the privilege based on an interpretation of § 54-84b and its application to undisputed facts, our review is plenary.

We begin our analysis with a review of the development of the marital communications privilege under Connecticut law. In *State* v. *Christian*, supra, 267 Conn. 730, this court recognized, for the first time, the existence of the marital communications privilege as part of Connecticut's common law.[9] In that case, the defendant was involved in a fatal automobile accident that killed an occupant of a car in which the defendant was riding. Thereafter, while in the hospital, the defendant quietly confided in his wife, when no others were present, that

he, rather than the deceased individual, had been the driver of the car. Id., 722. At trial, the defendant sought to prevent his wife from testifying about this communication. During voir dire, the defendant's wife conveyed that she and the defendant were separated and in the process of divorcing, that the marriage "'was very rocky'" at the time of the accident, and that, because the marriage was "over," preserving the confidentiality of the defendant's statement would not repair it. Id. Relying on this testimony, the trial court ruled that the privilege, to the extent it existed, did not apply, even though the communications were private and occurred during a valid marriage, because that "marriage irretrievably had broken down." Id., 723.

On appeal, this court confirmed that the marital communications privilege, which we previously had alluded to, was in fact "a fixture of our common law." Id., 730. We determined that a marital communication is privileged if (1) the communication was made to a spouse during a valid marriage and (2) the communication was confidential. Id., 731–32. We ultimately concluded that the trial court improperly had refused application of the privilege on the basis of the acrimonious state of the parties' marriage because that marriage, at the time of the communications, nevertheless was intact. Id., 735. Accordingly the first requirement was satisfied.

In formally adopting the privilege, we explained the well recognized principles underlying it: "The basis of the immunity given to communications between [spouses] is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails." (Internal quotation marks omitted.) Id., 728. "The marital communications privilege protects information privately disclosed between [spouses] in the confidence of the marital relationship—once described . . . as the best solace of human existence. . . . [T]he primary purpose of the confidential marital communication privilege is to foster marital relationships by encouraging confidential communication between spouses . . . . The privilege permit[s] [spouses] to communicate freely with one another without fear that their communications will be used against them at some future date. . . . We encourage married people to confide in each other by protecting their statements from later scrutiny in court." (Citations omitted; internal quotation marks omitted.) Id., 728–29. The marital communications privilege "exists to [e]nsure that spouses . . . feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law." (Internal quotation marks omitted.) Id., 729.

After *Christian* was decided, the legislature codified the privilege by enacting § 54-84b. That provision

defines "confidential communications" as "any oral or written communication made between spouses during a marriage that is intended to be confidential and is induced by the affection, confidence, loyalty and integrity of the marital relationship." General Statutes § 54-84b (a). Accordingly, we agree with the state that the legislature adopted the elements stated in *Christian*, but also added a third element, effectively narrowing the scope of the privilege.

"We ordinarily do not read statutes so as to render parts of them superfluous or meaningless." (Internal quotation marks omitted.) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 37, 848 A.2d 418 (2004); see *State* v. *Drupals*, 306 Conn. 149, 159, 49 A.3d 962 (2012) ("[s]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant" [internal quotation marks omitted]). Section 54-84b (a) provides the common-law elements that the communication must be made between spouses during a marriage and be intended to be confidential;[10] see *State* v. *Christian*, supra, 267 Conn. 710; but then adds the "induced by the affection" language, which is not found in the Connecticut common law, in the conjunctive. See *State* v. *Davalloo*, supra, 153 Conn. App. 433. Thus, the plain language of the statute compels us to view the "induced by the affection" requirement as a separate element that limits the privilege to those confidential communications made between spouses in a valid marriage that are "induced by the affection, confidence, loyalty and integrity of the marital relationship."[11] General Statutes § 54-84b (a). Consequently, in order for a communication to be privileged under § 54-84b, the communication must be: (1) made to a spouse during a marriage; (2) confidential; *and* (3) induced by the affection, confidence, loyalty and integrity of the marital relationship.

To aid in our analysis we look to the language of the statute. The word "induce" means "to bring on or bring about" or, alternatively, to "cause . . . ." Webster's Third New International Dictionary (2002). Accordingly, the statements must be "brought about" or "caused" by the affection, confidence, loyalty and integrity of the marital relationship. It therefore follows that if the statements are instead influenced by precisely the opposite, they would not qualify. The language of the statute, read as a whole, clearly contemplates one spouse confiding personal information truthfully in the other due to the special trust existing between the two, and not to the active concealment of a secret, nefarious undertaking designed to destroy the marriage.

In the present case, there are three categories of statements the trial court identified: (1) " 'statements made to the run-up of the murder of [Raymundo],' " including the " 'description of a faux triangle' "; (2) " '[s]tatements after the death of Raymundo to accom-

modate the relationship with Sessler' "; and (3) " 'statements leading up to and relative to the attack and attempted murder of [Christos].' "[12] *State* v. *Davalloo*, supra, 153 Conn. App. 430. As for the statements made during the period immediately preceding the murder of Raymundo, all of them were meant to deceive the defendant's spouse by being dishonest about her "brother's visits," the real actors in the faux love triangle, and the reasons she requested items from Christos. The statements after the death of Raymundo were meant not only to deceive and further her obsessive relationship with Sessler, but also to conceal her involvement in Raymundo's death. Finally, with regard to the statements leading up to the defendant's attempted murder of Christos, it is self-evident that her violence against her spouse vitiates any reasonable argument that these statements were "induced by . . . affection"[13] as required by § 54-84b (a).

Because the defendant's purpose in making the statements at issue was to further her extramarital affair with Sessler and to ultimately eliminate, by murdering, both Raymundo and Christos, whom she perceived as obstacles to that affair,[14] we agree with the determination by the trial court and the Appellate Court that the statements at issue here do not fall within the language of § 54-84b (a) because we simply cannot conceive of any scenario whereby the statements could have been "induced by the affection, confidence, loyalty and integrity" of the defendant's marital relationship as required under that statute.[15] In short, the defendant made statements to Christos that were indisputably not induced by affection or loyalty and, in the end, engaged in the ultimate betrayal of the spousal relationship, attempting to murder her husband. We, therefore, agree with the trial court that application of the marital communications privilege, in the particular facts and circumstances of this case, would be nothing short of bizarre.

The defendant argues that the trial court and the Appellate Court wrongfully looked at the state of the defendant's marriage, contrary to our holding in *Christian*.[16] We make short work of this argument because the Appellate Court explicitly stated that the nature of the marriage was not the focus of its analysis. *State* v. *Davalloo*, supra, 153 Conn. App. 434. Consistent with *Christian*, the Appellate Court agreed with the defendant that the nature of the marriage, whether acrimonious or harmonious, is not a factor in determining whether the privilege applies.[17] Id. Similarly, the trial court did not attempt to evaluate the quality of the defendant's marriage at the time she made the statements at issue, but rather, focused on the characteristics of the statements themselves. Indeed, the only fair reading of the trial court's and the Appellate Court's decisions is that they focused on the nature of the communication. Id. On the basis of the undisputed facts presented in this case, we conclude that the defendant's

communications fall well outside the marital communications privilege.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] General Statutes § 54-84b provides: "(a) For the purposes of this section, 'confidential communication' means any oral or written communication made between spouses during a marriage that is intended to be confidential and *is induced by the affection, confidence, loyalty and integrity of the marital relationship*.

"(b) Except as provided in subsection (c) of this section, in any criminal proceeding, a spouse shall not be (1) required to testify to a confidential communication made by one spouse to the other during the marriage, or (2) allowed to testify to a confidential communication made by one spouse to the other during the marriage, over the objection of the other spouse.

"(c) The testimony of a spouse regarding a confidential communication may be compelled, in the same manner as for any other witness, in a criminal proceeding against the other spouse for (1) joint participation with the spouse in what was, at the time the communication was made, criminal conduct or conspiracy to commit a crime, (2) bodily injury, sexual assault or other violence attempted, committed or threatened upon the spouse, or (3) bodily injury, sexual assault, risk of injury pursuant to section 53-21, or other violence attempted, committed or threatened upon the minor child of either spouse, or any minor child in the care or custody of either spouse." (Emphasis added.)

[2] The facts, while undisputed, have a direct bearing on the analysis of the privilege, which necessitates a longer discussion.

[3] Sessler's testimony confirmed that this interaction had occurred, in reality, with the defendant on his return flight from a bachelor party in Las Vegas. See *State* v. *Davalloo*, supra, 153 Conn. App. 423 n.2.

[4] In reality, Sessler did attempt to set up a date between a friend and the defendant. See *State* v. *Davalloo*, supra, 153 Conn. App. 424 n.3.

[5] The defendant and Christos were divorced in 2004. *State* v. *Davalloo*, supra, 153 Conn. App. 421 n.1.

[6] Specifically, the defendant argued that admission of testimony regarding the following topics was improper: "(1) stories about Melissa, Jack and Anna Lisa, (2) fictional visits from the defendant's brother, (3) the defendant's informing Christos that she bought a lock pick set to get into [Raymundo's] house to look for photographs, and her attempts to use the lock pick set on the front doors of their [own] condominium, (4) conversations about an eavesdropping device that the defendant wanted to place in Jack's office to listen to his conversations, (5) the defendant's questioning of Christos in late 2002 about DNA and fingerprints, (6) stories about Melissa's becoming upset when Jack rebuffed her sexual advances and Melissa's arranging to run into Jack at an airport and fly back home in the seat next to him, (7) in November, 2002, Christos' asking the defendant about Anna Lisa, and the defendant's reporting that Jack had ended his relationship with Anna Lisa and was dating Melissa exclusively, (8) in late November, 2002, the defendant's explaining that she had cut her thumb on a can of dog food, and (9) the events of the stabbing on March 23, 2003." *State* v. *Davalloo*, supra, 153 Conn. App. 430–31.

[7] This court granted the petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly construe . . . § 54-84b in concluding that the statements made by the defendant were not subject to the marital communication privilege?" *State* v. *Davalloo*, 314 Conn. 949, 103 A.3d 977 (2014).

[8] Because we decide the issue on the basis of our interpretation of the marital communication privilege, we need not address the state's arguments regarding disclosure and waiver, which it has presented as alternative grounds for affirming the Appellate Court's judgment.

[9] The other related testimonial privilege, the adverse spousal testimony privilege, had already been previously codified in General Statutes § 54-84a. *State* v. *Christian*, supra, 267 Conn. 725. "Under that privilege, the husband or wife of a criminal defendant has a privilege not to testify against his or her spouse in a criminal proceeding, provided that the couple is married at the time of trial." Id. In contrast, the marital communications privilege survives divorce. Id., 733.

[10] As the Appellate Court stated, the codified marital communications privilege does not entirely displace the common-law privilege. See *State* v.

*Davalloo*, supra, 153 Conn. App. 433 n.5; Conn. Code Evid. § 5-1 ("[e]xcept as otherwise required by the constitution of the United States, the constitution of this state, the General Statutes or the Practice Book, privileges shall be governed by the principles of the common law").

[11] Although the "induced by" language does not appear in any other state's codification of the marital communications privilege, some courts have invoked it in determining whether particular statements constitute a "confidential communication," subject to that privilege. See, e.g., *People* v. *Fediuk*, 66 N.Y.2d 881, 883, 489 N.E.2d 732, 498 N.Y.S.2d 763 (1985) ("[n]ot protective of all communications, the privilege attaches only to those statements made in confidence and that are induced by the marital relation and prompted by the affection, confidence and loyalty engendered by such relationship" [internal quotation marks omitted]). Frequently, the "induced by" language is used to refine what kind of communications between married spouses are confidential. See, e.g., *People* v. *Melski*, 10 N.Y.2d 78, 80, 176 N.E.2d 81, 217 N.Y.S.2d 65 (1961) (finding that New York's marital privilege was "designed to protect not all the daily and ordinary exchanges between the spouses, but merely those which would not have been made but for the absolute confidence in, and induced by, the marital relationship"); *State* v. *Freeman*, 302 N.C. 591, 597–98, 276 S.E.2d 450 (1981) (in determining "[w]hether a particular segment of testimony includes a 'confidential communication' . . . the question is whether the communication, whatever it contains, was induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship"); *State* v. *Richards*, 182 W. Va. 664, 668, 391 S.E.2d 354 (1990) ("[t]he test of whether the acts of the spouse come within the privilege against disclosure of confidential marital communications is whether the act or conduct was induced by or done in reliance on the confidence of the marital relation, i.e., whether there was an expectation of confidentiality" [internal quotation marks omitted]). Nevertheless, our legislature chose to add the language as a distinct element and thus, while related, the language must mean something more than communications made during a marriage that are confidential. See *State* v. *Davalloo*, supra, 153 Conn. App. 434 ("[i]f, as the defendant contends, the 'induced by affection' language merely describes the nature of marital relationships in general and is intended to protect 'personal feelings,' the language adds nothing to the 'during marriage' and confidentiality requirements").

[12] See also footnote 6 of this opinion.

[13] The legislature has indicated its disapproval of spousal violence. It expressly excluded from the privilege's protection the testimony of a spouse regarding a confidential communication in a criminal proceeding against the other spouse for "bodily injury, sexual assault or other violence attempted, committed or threatened upon the spouse . . . ." General Statutes § 54-84b (c) (2); see also *People* v. *Trzeciak*, 2013 IL 114491, paras. 50–52, 5 N.E.3d 141, 152–53 (Ill. 2013) (holding that defendant's spousal abuse and statements made during that abuse could not have been "made in reliance on the confidences of his marriage" and citing cases in accord from multiple jurisdictions).

[14] We reject the defendant's characterization of her statements, on appeal, as thinly veiled confessions of adultery. The trial court did not so find, and nothing about their content or the overall circumstances remotely suggests that they were confessional in nature.

[15] Because the applicability of the marital communications privilege necessarily depends on the facts and circumstances of a particular matter, we do not endeavor to articulate an all-encompassing explanation of what types of statements are "induced by the affection, confidence, loyalty and integrity of the marital relationship." General Statutes § 54-84b (a); see *People* v. *Fediuk*, 66 N.Y.2d 881, 883, 489 N.E.2d 732, 498 N.Y.S.2d 763 (1985) (under particular circumstances of case, presumption that communication between spouses was made under "mantle of confidentiality" not rebutted by fact that parties were not living together at time of communication or that marriage had deteriorated); *People* v. *Melski*, 10 N.Y.2d 78, 80, 176 N.E.2d 81, 217 N.Y.S.2d 65 (1961) ("since each case contains peculiar circumstances it is, as a practical matter, impossible to formulate an all-embracing definition or an infallible guide" [internal quotation marks omitted]).

[16] Additionally, the defendant seems to argue that the Appellate Court's interpretation only protects statements that further a harmonious marital relationship. The defendant mischaracterizes the Appellate Court's interpretation. The Appellate Court found, as do we, that the statements made simply cannot be said to be "induced by . . . affection," not that, in order for

any statement to be protected by the privilege, it must further a harmonious marriage. The state concedes that it is not necessary that the information communicated has to be positive vis-a-vis the likely effect on the marriage for the communication to be protected. For example, in *State* v. *Christian*, supra, 267 Conn. 722, the admission of drunk driving may not have been positive for the marriage but could have been induced by the perceived loyalty in the marriage.

[17] As we explained in *State* v. *Christian*, supra, 267 Conn. 734–35, "the reasons justifying the marital communications privilege . . . apply with equal force to married couples who, despite the appearance to outsiders of an irretrievably broken marriage, may still share hopes of reconciliation. . . . Although the defendant's marriage may have been acrimonious at the time that he had made the communications to his wife, the marital communications privilege nonetheless was valid." (Citation omitted; internal quotation marks omitted.) Despite the statutory addition of the "induced by" element in § 54-84b (a), we reaffirm this principle today. See, e.g., *People* v. *Fediuk*, 66 N.Y.2d 881, 883, 489 N.E.2d 732, 498 N.Y.S.2d 763 (1985) ("Communication between spouses is presumed to have been conducted under the mantle of confidentiality . . . . This presumption is not rebutted by the fact . . . that [the parties'] marriage has deteriorated, *for even in a stormy separation disclosures to a spouse may be induced by absolute confidence in the marital relationship* . . . ." [Citations omitted; emphasis added; internal quotation marks omitted.]).

_____